# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| AG ONCON, LLC, AG OFCON, LTD, CALAMOS MARKET NETRAL INCOME FUND, CAPITAL VENTURES INTERNATIONAL, CITADEL EQUITY FUND, LTD, OPTI OPPORTUNITY MASTER FUND, POLYGON CONVERTIBLE OPPORTUNITY MASTER FUND, and WOLVERINE FLAGSHIP FUND TRADING LIMITED, | ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2018-0556-JTL |
| LIGAND PHARMACEUTICALS INC., | ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: April 1, 2019
Date Decided: May 24, 2019

Elena C. Norman, Daniel M. Kirshenbaum, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Keith N. Sambur, Martin G. Durkin, Andrew T. Gillespie, HOLLAND & KNIGHT, LLP, New York, New York; *Counsel for Plaintiffs.*

David E. Ross, R. Garrett Rice, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Blair Connelly, Zachary L. Rowen, LATHAM & WATKINS LLP, New York, New York; *Counsel for Defendant.*

**LASTER, V.C.**

The plaintiffs hold convertible notes issued by defendant Ligand Pharmaceuticals Inc. Ligand sold the notes in underwritten private placements based on disclosures in an offering memorandum. At closing, Ligand entered into an indenture to govern the notes.

The indenture authorized Ligand to conform its terms to the description of the notes in the offering memorandum. Three-and-a-half years after issuing the notes, Ligand invoked this right to replace a defined term in the conversion formula in the indenture.

The offering memorandum explained that the conversion value of the notes would depend on the "daily VWAP," defined as the value-weighted average price of Ligand's stock on each day of a fifty-trading-day observation period. The offering memorandum stated that for each trading day, the conversion value would be divided by the daily VWAP, generating a value-equivalent number of shares for that day.

Unfortunately, the indenture used a different term in the denominator of the conversion formula. Instead of referring to the daily VWAP, the indenture referred to the "Daily Principal Portion." That term was defined as one-fiftieth of the principal due on the note. It was a fixed dollar amount ($20 per $1,000 of issuance) that had nothing to do with the trading price of Ligand's stock, and its use made no sense in light of what the formula attempted to calculate. Exercising its right to conform the terms of the indenture to the offering memorandum, Ligand replaced the reference to the Daily Principal Portion with a reference to the daily VWAP.

The plaintiffs are sophisticated bond traders who purchased the notes in the secondary market. In this lawsuit, they seek to invalidate the amendment and enforce the

conversion formula as it originally appeared in the indenture. The relief they seek would give them munificent returns. The notes Ligand issued have a face value of $245 million. Four years after issuance, the plaintiffs claim they are entitled to conversion consideration amounting to $4 billion.

According to the plaintiffs, Ligand's exercise of its right to conform the terms of the indenture to the description of the notes in the offering memorandum improperly elevated the offering memorandum over the indenture. They also say that the change contravened restrictions on Ligand's ability to amend the indenture and violated the requirements of the Trust Indenture Act. Ligand moved to dismiss the complaint for failure to state a claim. This decision grants Ligand's motion.

## I.      FACTUAL BACKGROUND

The facts are drawn from the complaint and the documents it incorporates by reference. At this stage of the proceedings, the complaint's allegations are assumed to be true. The plaintiffs also receive the benefit of all reasonable inferences, including inferences drawn from documents.

### A.      The Offering Memorandum

In August 2014, Ligand sought to raise capital through underwritten private placements of 0.75% Convertible Senior Notes. A convertible note is a debt instrument that is convertible into shares of the issuer's stock at a specified conversion rate. The conversion rate is determined when the notes are issued. The conversion feature is "in the money" when the value of the shares that would be received upon conversion exceeds the value of the note as a debt instrument.

Ligand and its underwriters marketed the notes through a confidential offering memorandum dated August 12, 2014. *See* Compl. Ex. C (the "Offering Memorandum" or "OM"). In a thirty-one-page section titled "Description of the Notes," the Offering Memorandum described the consideration that the holder of a note would receive in various scenarios. The Offering Memorandum explained that the conversion rate for a note with a principal amount of $1,000 was 13.3251, meaning that a $1,000 note could be converted into 13.3251 shares of Ligand common stock (assuming all of the requirements for conversion were met). To protect the conversion value in the event of changes to Ligand's capital structure, the conversion rate was subject to adjustment for transactions that would affect the ownership percentage reflected by 13.3251 shares, such as issuances of new shares, stock splits, warrant distributions, or self-tenders. Generally speaking, the adjustments would ensure that the conversion rate generates a number of shares that is equivalent in value to 13.3251 shares under Ligand's capital structure as it existed when the notes were issued.

From the noteholders' standpoint, the conversion rate of 13.3251 meant that the conversion feature would be in the money when the value of 13.3251 shares of Ligand common stock exceeded $1,000. The Offering Memorandum explained that the conversion rate was "equivalent to an initial conversion price of approximately $75.05 per share of our common stock." *Id.* at 26. Once the value of Ligand's stock crossed that threshold, then the conversion feature would be more valuable than the debt instrument. If Ligand's stock price continued to climb, then the value of the conversion feature would increase. When Ligand issued the notes, its stock was trading in the mid-fifties.

3

The Offering Memorandum framed these concepts as mathematical formulas. Those formulas were not so simple as multiplying the value of the notes times the conversion rate, then dividing by Ligand's stock price on the day of conversion. To protect against stock price volatility, the offering memorandum called for identifying an observation period of fifty consecutive trading days, and it broke up the conversion consideration into fifty pieces, one for each day in the observation period. The Offering Memorandum described the piece of consideration due for each day as the "Daily Settlement Amount." Upon conversion, the noteholder would receive the sum of fifty Daily Settlement Amounts.

Each Daily Settlement Amount consisted of two components of consideration:

- an amount of cash equal to the lesser of (i) one-fiftieth (1/50th) of $1,000 [*i.e.*, $20] and (ii) the daily conversion value for such VWAP trading day (such minimum, the "**daily principal portion**"); and

- to the extent the daily conversion value for such VWAP trading day exceeds the daily principal portion for such VWAP trading day, a number of shares equal to (i) the excess of the daily conversion value for such VWAP trading day over the daily principal portion for such VWAP trading day, divided by (ii) the daily VWAP for such VWAP trading day (the "**daily share amount**").

*Id.* at 31 (emphasis added). The Offering Memorandum defined the daily conversion value as "one-fiftieth (1/50th) of the product of (i) the conversion rate on such VWAP trading day and (ii) the daily VWAP on such VWAP trading day." *Id.* In other words, it called for calculating the daily conversion value by multiplying the conversion rate of 13.3251 times the daily VWAP, then dividing by fifty.

The output of the formula in the first bullet—the "Daily Principal Portion"—determined whether the conversion feature was in the money. It called for comparing the

4

daily conversion value with one-fiftieth of the face value of a $1,000 note ($20). The converting noteholder would receive the "lesser" of the two, so the conversion feature would not have value (and a rational noteholder would not convert) unless the daily conversion value exceeded $20. If the conversion feature was in the money, then the formula caused the Daily Principal Portion to equal $20.

Once the note was in the money, then the output of the formula in the second bullet—the "Daily Share Amount"—determined the value of the conversion feature. It was defined as "a number of shares equal to (i) the excess of the daily conversion value for such VWAP trading day over the daily principal portion for such VWAP trading day, divided by (ii) the daily VWAP for such VWAP trading day." *Id.* at 31. In this formula, dividing the in-the-money portion by the daily VWAP converted the former into a value-equivalent number of shares. Although framed in shares for purposes of the calculation, Ligand could pay the resulting value in any combination of cash or stock. *See id.* at 26.

An example illustrates the calculation. Assuming Ligand's shares had a daily VWAP of $207.17 for one of the fifty days in the observation period (equal to Ligand's closing price at the end of the second quarter of 2018), then the formulas would generate the following results:

| | Formula | Value | Reference |
|---|---|---|---|
| Daily Principal Portion for the Day | (1/50) x $1,000 = | $20 | (A) |
| Daily VWAP for the Day | Assumed to be | $207.17 | (B) |
| Conversion Rate | Defined as | 13.3251 | (C) |
| Daily Conversion Value | (1/50) x [(C) x (B)] = | $55.21 | (D) |
| Excess of Daily Conversion Value over Daily Principal Portion | (D) - (A) = | $35.21 | (E) |
| Daily Shares Owed for Excess of Conversion Value over Daily Principal Portion: | (E) / (B) = | 0.1700 | (F) |
| Number of Shares Equivalent to Face Value | (A) / (B) = | 0.0965 | (J) |
| **Total Number of Shares / Share Equivalents Owed Upon Conversion for the Day:** | (F) + (J) = | 0.2665 | |

The formulas in the Offering Memorandum ensured that regardless of what price the stock reached, a noteholder who converted an in-the-money note would always receive value in the aggregate equal to 13.3251 shares of Ligand stock. Of this amount, Ligand would pay the fifty Daily Principal Portions in cash, and it could pay the fifty Daily Share Amounts in either cash or stock.

## B. The Indenture

After the underwriters had lined up purchasers, Ligand closed the offering. The closing took place on April 18, 2014, four days after the issuance of the Offering Memorandum. At closing, Ligand entered into an indenture to govern the notes. *See* Compl. Ex. A. (the "Indenture" or "Ind."). In the aggregate, the notes issued under the Indenture had a face value of approximately $245 million in principal.

The Indenture reflected the same initial conversion rate as the Offering Memorandum: "[A] Holder shall have the right, . . . to convert the principal amount of its Notes, . . . at a conversion rate initially equal to 13.3251 shares of the Common Stock . . . per $1,000 principal amount of Notes." *Id.* § 10.01(a). As in the Description of the Notes in the Offering Memorandum, the Indenture established a fifty-day observation period for determining the daily VWAP. *See id.* §§ 1.01, 10.03. And like the Description of the Notes, the Indenture separated the Daily Settlement Amount into (i) the Daily Principal Portion, reflecting the 1/50th of the principal amount of the note, and (ii) the Daily Share Amount, reflecting 1/50th of the in-the-money conversion feature. *See id.* § 1.01.

But the conversion formula in the Indenture differed from the conversion formula in the Offering Memorandum in one critical respect. In the Indenture, the definition of the Daily Share Amount called for the noteholder to receive a number of shares equal to (i) the excess of the Daily Conversion Value over the Daily Principal Portion divided by (ii) *the Daily Principal Portion*. *Id.* § 1.01. The definition in the Indenture thus changed the denominator in the conversion formula from the daily VWAP to the Daily Principal Portion.

Using the Daily Principal Portion as the denominator for the Daily Share Amount radically changed the conversion calculation. The Daily Share Amount was supposed to reflect the in-the-money portion of the conversion consideration, and using the daily VWAP as a denominator meant that the trading price would be used to convert the value back into shares and maintain the conversion rate. The Daily Principal Portion, by contrast, was a fixed number ($20) tied to the unchanging face value of the notes. Its introduction

7

into the denominator meant that the formula no longer calculated the value-equivalent of 13.3251 shares per day. The formula instead derived a number divorced from that figure.

For example, assuming a VWAP of $207.17 across the fifty-day observation period, a note with a face value of $1,000 would convert into more than ninety-two shares, nearly seven times the conversion rate. And as Ligand's stock price increased, the number of conversion shares would increase. Assuming the entire note issuance converted, the following chart illustrates the total number of shares Ligand would issue upon conversion using the formula in the Offering Memorandum (3,264,650), Ligand's total number of authorized shares (33,333,333), and the total number of shares that Ligand would have to issue under the formula in the Indenture (rising to >50,000,000).



C. The Conversion Formula Amendment

After Ligand completed the private placements, the notes traded in the secondary markets. During this period, Ligand's public filings described the conversion formula for

8

the notes in a manner consistent with the Offering Memorandum. In other words, the filings described the denominator in terms of the daily VWAP, not the Daily Principal Portion.

In February 2018, Ligand amended the definition of Daily Share Amount in the Indenture. The amendment substituted the words "daily VWAP for a VWAP Trading Day" for the words "Daily Principal Portion for such Trading Day" as the divisor in the Daily Share Amount formula. This decision refers to this change as the "Conversion Formula Amendment."

By adopting the Conversion Formula Amendment, Ligand conformed the formula in the Indenture to the description in the Offering Memorandum. When doing so, Ligand relied on a section in the Indenture which authorizes Ligand to amend the Indenture to conform its terms to the Description of the Notes in the Offering Memorandum. *See id.* § 9.01(b).

**D. This Litigation**

The plaintiffs bought their notes in market transactions. In total, they acquired notes reflecting a principal amount of approximately $212 million, representing 95% of the issued and outstanding notes. The plaintiffs contend that they acquired the notes because of the conversion formula in the Indenture. They claim that upon conversion, based on that formula, they would be entitled to consideration worth approximately $3.8 billion.

On July 27, 2018, the plaintiffs filed this action. The operative complaint asserts that the Conversion Formula Amendment improperly elevated the Offering Memorandum over the Indenture as the controlling document, breached the terms of the Indenture, and violated Section 316(b) of the Trust Indenture Act. The complaint seeks declaratory

9

judgments invalidating the Conversion Formula Amendment. The complaint also seeks damages and an award of attorneys' fees. Ligand moved to dismiss pursuant to Rule 12(b)(6) for failure to state a claim on which relief can be granted.

## II. LEGAL ANALYSIS

When considering a motion to dismiss for failure to state a claim, this court (i) accepts as true all well-pleaded factual allegations in the complaint, (ii) credits vague allegations if they give the opposing party notice of the claim, and (iii) draws all reasonable inferences in favor of the plaintiffs. *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002). In applying this standard, "dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof." *Id.* (internal quotation marks omitted).

Section 9.01(b) of the Indenture states that Ligand "may amend . . . this Indenture or the Notes without the consent of any Holder to: . . . conform the terms of this Indenture or the Notes to the 'Description of the Notes' section of the Offering Memorandum." Ind. § 9.01(b) (the "Conforming Amendment Provision"). The Conversion Formula Amendment conformed the terms of the conversion formula in the Indenture to the terms set out in the Description of the Notes section of the Offering Memorandum. Ligand contends that it validly adopted the Conversion Formula Amendment by exercising its right under the Conforming Amendment Provision.

In this litigation, the plaintiffs advance three claims as to why the Conversion Formula Amendment could not have had this effect. First, they claim that the Indenture constituted the complete and final agreement governing the notes such that Ligand could

10

not rely on the Offering Memorandum when effectuating the Conversion Formula Amendment. Second, they argue that the Conversion Formula Amendment breached provisions of the Indenture that foreclose material and adverse amendments to the terms of the notes without noteholder consent. Third, they argue that the Conversion Formula Amendment violated the Trust Indenture Act.

## A.    The Complete Agreement Claim

The plaintiffs first claim that the Indenture represented the complete and final agreement governing the notes, such that Ligand could not subsequently rely on the Offering Memorandum to implement the Conversion Formula Amendment. The problem with this argument is that the Indenture itself contained the Conforming Amendment Provision, which allowed Ligand to conform the Indenture to the Offering Memorandum. This right does not depend on any language or document outside of the Indenture. It is part of the Indenture itself.

When advancing this argument, the plaintiffs observe that the Offering Memorandum recited that it was subject to the terms of the Indenture. They quote the following passage:

> **We will issue the notes under an indenture (the "indenture"),** to be entered into upon the closing of this offering, between us and Wilmington Trust, National Association, as trustee (the "trustee"). The terms of the notes include those expressly set forth in the indenture and those made part of the indenture by reference to certain provisions of the Trust Indenture Act of 1939, as amended (the "Trust Indenture Act"). You may request a copy of the indenture,

11

which includes the form of the notes, from us. See "Where You Can Find More Information."

The following description is a summary of the material provisions of the notes and the indenture and does not purport to be complete. **This summary is subject to, and is qualified by reference to, all of the provisions of the notes and the indenture, including the definitions of certain terms used in the notes and the indenture. We urge you to read these documents because they, and not this description, define your rights as a holder of the notes**.

OM at 23 (emphasis added). This argument does not present any problem for Ligand because the Indenture itself contains the Conforming Amendment Provision. Ligand is not relying on any rights outside the Indenture. The Conforming Amendment Provision is one of the terms of the Indenture, and it permits Ligand to amend the Indenture to conform its terms to the Description of the Notes. Once amended, those terms became part of the Indenture. At no time did Ligand rely on any terms outside of the Indenture.

Along similar lines, the plaintiffs cite the common law rule that when an indenture and its prospectus conflict, "the indenture controls."[1] Based on this proposition, they contend that when Ligand executed the Indenture, that document became binding and superseded the Offering Memorandum. As a result, the plaintiffs say, Ligand cannot subsequently rely on the Offering Memorandum. This version of the argument suffers from the same logical flaw as its prior incarnation: Ligand is not relying on the terms of the

---

[1] *In re W.T. Grant Co.*, 4 B.R. 53, 73 (Bankr. S.D.N.Y. 1980); *see Bank of N.Y. v. BearingPoint, Inc.*, 824 N.Y.S.2d 752, at *8 (N.Y. Sup. Ct. 2006) (TABLE); *M & T Bank Corp. v. LaSalle Bank Nat'l Ass'n*, 852 F. Supp. 2d 324, 331–34 (W.D.N.Y. 2012); *see also In re Discon Corp.*, 346 F. Supp. 839, 844 (S.D. Fla. 1971).

Offering Memorandum. It is relying on the terms of the Indenture, which included the Conforming Amendment Provision and permitted Ligand to effectuate the Conversion Formula Amendment. At all times and for all purposes, Ligand has relied on the terms of the Indenture, not the Offering Memorandum.

The plaintiffs further rely on Section 8-202(a) of the New York Uniform Commercial Code, which limits the terms of a certificated security to the terms stated "on the certificate and terms made part of the security by reference on the certificate to another instrument, indenture, or document or to a constitution, statute, ordinance, rule, regulation, order, or the like, to the extent the terms referred to do not conflict with terms stated on the certificate." N.Y. U.C.C. § 8-202(a). The plaintiffs argue that the global certificate issued for the notes only referenced the Indenture and did not reference the Offering Memorandum. Therefore, they say, Ligand could not conform the Indenture to the Offering Memorandum, because that would "conflict with the terms stated on the certificate." But the certificate refers to the Indenture, which contains the Conforming Amendment Provision. Ligand's reliance on the Conforming Amendment Provision is thus consistent with the terms stated on the certificate.

## B. The Material And Adverse Amendment Claim

The plaintiffs next claim that the Conversion Formula Amendment materially and adversely amended the noteholders' rights without their consent in violation of Sections 6.07 and 9.02 of the Indenture. The plaintiffs assert that Ligand cannot rely on the Conforming Amendment Provision, because that provision must be read in conjunction with Sections 6.07 and 9.02. As the plaintiffs interpret these provisions, they prohibit

Ligand from using the Conforming Amendment Provision for amendments that would materially and adversely affect the noteholders' rights. Ligand responds that the Conforming Amendment Provision means what it says and permits any amendment necessary to conform the Indenture to the Offering Memorandum. This decision agrees with Ligand.

"[T]he proper interpretation of language in a contract is a question of law. Accordingly, a motion to dismiss is a proper framework for determining the meaning of contract language." *Allied Capital Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006) (Strine, V.C.). "When deciding such a motion, however, the Court may not choose between two opposing interpretations if both interpretations are reasonable." *MCG Capital Corp. v. Maginn*, 2010 WL 1782271, at *8 (Del. Ch. May 5, 2010). "When the language of a contract is plain and unambiguous, binding effect should be given to its meaning." *Allied Capital*, 910 A.2d at 1030. If the provision is ambiguous, then its proper application "is a question of fact that cannot be determined on a motion to dismiss." *Maginn*, 2010 WL 1782271, at *8.

New York law governs the Indenture. *See* Ind. § 12.08. Under New York law, the "[i]nterpretation of indenture provisions is a matter of basic contract law." *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1049 (2d Cir. 1982). When interpreting a contract, "[t]he court should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed." *William C. Atwater & Co., Inc. v. Panama R.R. Co.*, 159 N.E. 418, 419 (N.Y. 1927). "Particular words should be considered, not as if isolated from the context, but in light of the obligation as a

14

whole and the intention of the parties as manifested thereby." *Id.* at 419; *accord Kass v. Kass*, 696 N.E.2d 174, 180–81 (N.Y. 1998); *Riverside S. Planning Corp. v. CRP/Extell Riverside, L.P.*, 920 N.E.2d 359, 363 (N.Y. 2009). "Ambiguity is determined by looking within the four corners of the document, not to outside sources." *Kass*, 696 N.E.2d at 180.

In this case, reading the Indenture as a whole establishes that Ligand could rely on the Conforming Amendment Provision to effectuate the Conversion Formula Amendment. The Indenture's terms recognize that the Description of the Notes section in the Offering Memorandum established the baseline terms for the notes. In the Conforming Amendment Provision, the Indenture authorizes any amendments necessary to conform the Indenture to those baseline terms. Other provisions in the Indenture restrict amendments that would depart from the baseline terms. These provisions limit midstream amendments. They do not apply to amendments necessary to conform the Indenture to the baseline terms set forth in the Offering Memorandum.

Article Nine of the Indenture reflects this structure. It divides types of amendments into two categories: those that do not require noteholder consent and those that do. In Section 9.01, the Indenture identifies the former. In Section 9.02, the Indenture identifies the latter.

The subparts of Section 9.01 identify amendments that would preserve the original terms of the deal as marketed or facilitate compliance with those terms. In addition to the Conforming Amendment Provision, Ind. § 9.01(b), the amendments authorized by Section 9.01 include the following:

- "cure any ambiguity, omission, defect or inconsistency in the Indenture or in the Notes in a manner that does not adversely affect the rights of any Holder in any material respect," *id.* § 9.01(a);

- "make provision with respect to the conversion rights of the Holders in accordance with Section 10.06 hereof," *id.* § 9.01(c);

- "provide for the assumption by a successor corporation of the Company's obligations under this Indenture," *id.* § 9.01(d);

- "add guarantees with respect to the Notes," *id.* § 9.01(e);

- "make any change that does not adversely affect the rights of any Holder," *id.* § 9.01(h); and

- "comply with the rules of any applicable securities depositary," *id.* § 9.01(j).

In each case, the purpose of the amendment is to fulfill the original terms of the notes.

Section 9.02 provides generally that all other amendments require "the written consent of the Holders of at least a majority in aggregate principal amount," but excepts a list of specific amendments that require "the consent of each affected Holder." Each of these amendments would alter a financial term of the original deal. The list includes amendments that would:

- "reduce the rate of or extend the stated time for payment of interest," *id.* § 9.02(b);

- "reduce the principal amount," *id.* § 9.02(c);

- "extend the Maturity Date," *id.*;

- "make any change that impairs or adversely affects the conversion rights of any Notes," *id.* § 9.02(d);

- "make any Note payable in a [different] currency," *id.* § 9.02(f); or

- "impair the right of any Holder to receive payment of the principal . . . of, and interest . . . on, such Holder's Notes on or after the due dates therefor," *id.* § 9.02(h).

In each case, the amendment would alter the original terms of the notes.

16

To contend that Ligand could not implement the Conversion Formula Amendment, the plaintiffs rely on Section 9.02(d), which requires the consent of every affected holder for "any change that impairs or adversely affects the conversion rights of any Notes under Article 10 hereof." *Id.* § 9.02(d). According to the plaintiffs, this section qualifies the Conforming Amendment Provision to mean that Ligand can only make conforming amendments that do not "impair[] or adversely affect[] the conversion rights."

Nothing in Section 9.02(d) suggests that it trumps the Conforming Amendment Provision or operates "notwithstanding" other sections of the Indenture. This is significant because when the drafters of the Indenture wanted to make one section of the Indenture supersede other sections, they used the preposition "notwithstanding" to signal that expressly.[2] Likewise, nothing in the Conforming Amendment Provision makes it subject to Section 9.02(d) or limits its operation to amendments that do not impair or adversely affect the noteholders' conversion rights. Here too, when the drafters wanted to limit the power to amend, they did so expressly.[3] By not introducing these qualifiers, the drafters of the Indenture indicated that the Conforming Amendment Provision would operate independently and on its own terms. *See Quadrant Structured Prods. Co. v. Vertin*, 23

---

[2] *See, e.g., id.* §§ 2.06(b), 2.12(a), 2.12(d)(i), 2.12(e), 2.14, 3.10(a), 3.11, 3.12, 4.02(a), 4.02(d), 4.02(e), 5.01(b), 6.01(a), 6.01(c), 6.07, 7.02(n), 10.03(b), 10.03(c), 10.04(c)(i), 10.04(c)(ii), 10.04(f), 10.04(j), 10.07(c), 10.07(d).

[3] *See, e.g., id.* § 9.01(a) (limiting permitted amendments to those that do "not adversely affect the rights of any Holder in any material respect"); *id.* § 9.01(h) (permitting amendments that do "not adversely affect the rights of any Holder").

N.Y.3d 549, 560 (2014) ("[I]f parties to a contract omit terms—particularly, terms that are readily found in other, similar contracts—the inescapable conclusion is that the parties intended the omission.").

And this makes sense, because the Conforming Amendment Provision and Section 9.02(d) serve different purposes. The Conforming Amendment Provision ensures that the terms of the Indenture match the original terms of the deal as marketed in the Offering Memorandum. Although nominally styled as an "amendment" for purposes of Section 9.01(b), invoking the Conforming Amendment Provision does not amend the deal at all. It maintains the original deal by conforming the terms of the Indenture to the original terms. Section 9.02(d), by contrast, serves a different purpose. It prohibits departures from the original deal unless every affected noteholder consents. Unlike the Conforming Amendment Provision, Section 9.02(d) governs true midstream amendments.

The Conversion Formula Amendment fell within the scope of the Conforming Amendment Provision. It did not amend the original deal; it preserved it by conforming the language of the Indenture to the marketed terms. If Ligand had attempted to depart from the original deal, then Section 9.02(d) would have applied and required noteholder consent.

In a related argument, the plaintiffs assert that the Conversion Formula Amendment contravened Section 6.07, which limits the ability of Ligand to amend the Indenture in a manner that would adversely affect the noteholders' ability to bring suit to enforce their payment rights. Section 6.07 states:

> Notwithstanding any other provision of the Indenture, the right of any Holder to bring suit for the enforcement of payment of principal, accrued and unpaid interest (including Additional Interest and Special Interest), if any, or

18

payment of the Fundamental Change Purchase Price on or after the respective due dates, or the right to receive consideration due upon conversion of Notes in accordance with Article 10, shall not be impaired or affected without the consent of such Holder . . . .

Ind. § 6.07. Unlike Section 9.02(d), Section 6.07 uses the preposition "notwithstanding," so it would trump the Conforming Amendment Provision. But Section 6.07 does not apply to a change in the conversion formula; it protects the right to bring suit.

The provisions of the Indenture that protect against changes to the amount of principal, interest, and conversion consideration are found in Sections 9.02(b), (c), and (d). Read in conjunction with the Conforming Amendment Provision, these sections state that Ligand cannot make any adverse change in the amount of principal, interest, or conversion consideration without obtaining consent from each adversely affected holder, except to conform the Indenture to the original deal set forth in the Offering Memorandum. Section 6.07 provides a different form of protection. It protects the noteholders' "right . . . to bring suit for the enforcement of" their economic rights. In other words, it protects the right to sue, not the underlying economic right. *See* Am. Bar Ass'n, *Revised Model Simplified Indenture*, 55 Bus. Law. 1115, 1215 (2000) ("Section 6.07 prescribes that each Secuirtyholder's right to sue to enforce the conversion privilege may not be impaired or affected without such holder's consent."). Section 6.07 thus does not independently protect the conversion rights from amendment, and it is inapplicable here.

Under the Conforming Amendment Provision, Ligand exercised its right to conform the terms of the Indenture to the description of the notes in the Offering Memorandum. That is all that the Conversion Formula Amendment did, so Ligand was authorized to

implement it without noteholder consent. If Ligand had tried to make any other changes in the noteholders' conversion rights, then Section 9.02(d) would have applied and required consent from each adversely affected noteholder. But Ligand only made conforming changes, which it was authorized to do. The plaintiffs have therefore failed to state a claim that the Conforming Amendment Provision violated the Indenture.

## C. The Trust Indenture Act

Last, the plaintiffs argue that the Conversion Formula Amendment violated Section 316(b) of the Trust Indenture Act, which states:

> Notwithstanding any other provision of the indenture to be qualified, the right of any holder of any indenture security to receive payment of the principal of and interest on such indenture security, on or after the respective due dates expressed in such indenture security, or to institute suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such holder except as to a postponement of an interest payment consented to as provided in paragraph (2) of subsection (a), and except that such indenture may contain provisions limiting or denying the right of any such holder to institute any such suit, if and to the extent that the institution or prosecution thereof or the entry of judgment therein would, under applicable law, result in the surrender, impairment, waiver, or loss of the lien of such indenture upon any property subject to such lien.

15 U.S.C. § 77ppp(b). According to the plaintiffs, Section 316(b) prohibited Ligand from unilaterally amending their conversion rights. This argument fails because Section 316(b) does not apply to the Indenture. The plaintiffs respond that the terms of the Indenture nevertheless voluntarily incorporated the restrictions imposed by Section 316(b), but the language of the Indenture does not support their argument. Regardless, Section 316(b) would not prohibit the Conversion Formula Amendment.

### 1. Section 316(b) Does Not Apply To The Indenture.

Section 316(b) does not apply to the Indenture because the Indenture was not an "indenture security" for purposes of the Trust Indenture Act. As quoted above, Section 316(b) protects "the right of any holder of any *indenture security* to receive payment of the principal of and interest on such *indenture security*, on or after the respective due dates expressed in such *indenture security* . . . ." *Id.* § 77ppp(b) (emphasis added). The Trust Indenture Act defines the term "indenture security" to mean "any security issued or issuable under the indenture to be qualified." *Id.* § 77ccc(11). An "indenture to be qualified" is defined as "(A) the indenture under which there has been or is to be issued a security in respect of which a particular registration statement has been filed, or (B) the indenture in respect to which a particular application has been filed." *Id.* § 77ccc(9).

The Indenture was not an "indenture to be qualified" under prongs (A) or (B). The complaint recognizes that Ligand never filed a registration statement and never applied for qualification. In fact, Ligand stated in the Offering Memorandum that "we do not currently intend to seek such qualification." Ind. at 49.

In response, the plaintiffs imply that that the Indenture *should have been* qualified under the Trust Indenture Act, and therefore Section 316(b) applies. This argument fails because the Indenture was exempt from the Trust Indenture Act's qualification requirements.

A complex set of provisions gives rise to the qualification requirements for non-publicly offered securities. The starting point is Section 307 of the Trust Indenture Act, which states:

21

> In the case of any security which is not required to be registered under the Securities Act of 1933 and to which subsection (a) of section 77fff of this title [*i.e.*, Section 306] is applicable notwithstanding the provisions of section 77ddd of this title [*i.e.*, Section 304], an application for qualification of the indenture under which such security has been or is to be issued shall be filed with the Commission by the issuer of such security.

15 U.S.C. § 77ggg(a). Section 307 thus frames the qualification requirement in terms of whether the security is one "to which subsection (a) of Section 306 is applicable notwithstanding the provisions of Section 304." Examining Sections 306(a) and 304 of the Trust Indenture Act shows that the latter is the important provision. Rather than addressing what securities must be qualified, Section 306(a) prohibits any person from using means of interstate commerce to disseminate, sell, or convey a security "which is not registered under the Securities Act of 1933 and to which this subsection is applicable notwithstanding the provisions of section 77ddd of this title [*i.e.* Section 304]." *Id.* § 77fff(a).

Section 304, by contrast, addresses the universe of securities that must be qualified by specifying a list of exemptions. Section 304(a) exempts certain special securities from the Trust Indenture Act in its entirety.[4] Section 304(b) provides a narrower exemption from Sections 305 and 306 of the Trust Indenture Act for

> (1) any of the transactions exempted from the provisions of section 5 of the Securities Act of 1933 by section 4 thereof, or

---

[4] *See, e.g.*, *id.* § 77ddd(a)(4) (exempting "(A) any security exempted from the provisions of the Securities Act of 1933 by paragraph (2) to (8), (11), or (13) of section 3(a) thereof; (B) any security exempted from the provisions of the Securities Act of 1933, as amended, by paragraph (2) of subsection 3(a) thereof, as amended by section 401 of the Employment Security Amendments of 1970").

(2) . . . any transaction which would be so exempted but for the last sentence of paragraph (11) of section 2(a) of such Act.

*Id.* § 77ddd(b) (formatting added). The transactions covered by part (1) of this exemption include "transactions by an issuer not involving any public offering." *Id.* § 77d(a)(2).

We thus reach the endpoint: A transaction not involving a public offering is not subject to qualification.[5] Ligand's issuance did not involve a public offering, so it was exempt from the Trust Indenture Act under Sections 304(b), 306, and 307. The Indenture was therefore not an "indenture security," and it was not subject to Section 316(b).

**2.  The Agreement Does Not Incorporate The Entire Trust Indenture Act.**

The plaintiffs respond that the drafters of the Indenture chose to incorporate the terms of the Trust Indenture Act, making Section 316(b) applicable even though it otherwise would not apply. For support they rely on Section 9.06 of the Indenture, which states: "Every supplemental indenture executed pursuant to this Article shall comply with the [Trust Indenture Act]." This one provision does not do the trick. Instead, the language

---

[5] *See Abbate v. Wells Fargo Bank, N.A.*, 2011 WL 13128742, at \*4 (C.D. Cal. Apr. 25, 2011) ("[T]he TIA does not govern private placements . . . ."); *In re Magnatrax Corp.*, 2003 WL 22807541, at \*15 (D. Del. Nov. 17, 2003) (holding that notes offered in private placement were "exempt from the TIA by virtue of Section 304(b)"). This is a slight overstatement. There are two special types of issuances that still require qualification, but neither is present here. *See generally* James Gadsden, *Introduction to the Annotated Trust Indenture Act*, 67 Bus. Law. 979, 1054 (2012) (explaining the relationship between Sections 304, 306, and 307 and citing legislative history in support of the conclusion that the Trust Indenture Act only applies to registered offerings, except for "(a) indenture securities issued in exchange for other securities of the same issuer, and (b) indenture securities issued in connection with a judicial reorganization").

23

of the Indenture, read as a whole, evidences an intention to incorporate only specific provisions of the Trust Indenture Act.

Section 1.01 of the Indenture defines the "Indenture" as "this Indenture, as amended or supplemented from time to time in accordance with the terms hereof, including the provisions of the [Trust Indenture Act] that are deemed to be a part hereof." Consistent with this definition, Section 1.03 of the Indenture explains that "[w]henever this Indenture refers to a provision of the [Trust Indenture Act], the provision is incorporated by reference in and made a part of this Indenture." As suggested by this language, various provisions in the Indenture refer to and incorporate specific sections of the Trust Indenture Act.[6] In some instances, the provision in the Indenture modifies how the section of the Trust Indenture Act will operate when incorporated into the Indenture.[7]

---

[6] *See, e.g.*, Ind. § 4.02(a) ("The Company shall comply with the other provisions of TIA Section 314(a)."); *id.* § 7.06 ("Within 120 days of each December 31, commencing on December 31, 2014, and for so long as any notes remain outstanding, the Trustee shall mail to each Holder a brief report dated as of December 31 of such year that complies with TIA Section 313(a), if and to the extent required by such subsection. The Trustee shall also comply with TIA Section 313(b). The Trustee will also transmit by mail all reports as required by TIA 313(c)."); *id.* § 7.10 ("The Trustee shall at all times satisfy the requirements of TIA Section 310(a)."); *id.* § 7.11 ("A Trustee who has resigned or been removed shall be subject to TIA Section 311(a) to the extent indicated therein."); *id.* § 12.03 ("Holders may communicate pursuant to TIA Section 312(b) with other Holders with respect to their rights under this Indenture or the Notes. The Company, the Trustee, the Registrar, the Paying Agent, the Conversion Agent and anyone else shall have the protection of TIA Section 312(c).").

[7] *See, e.g.*, *id.* § 7.10 ("The Trustee shall comply with TIA Section 310(b), subject to the penultimate paragraph thereof; *provided, however*, that there shall be excluded from the operation of TIA Section 310(b)(1) any indenture or indentures under which other securities or certificates of interest or participation in other securities of the Company are

24

The Indenture never incorporates the Trust Indenture Act as a whole, nor does it incorporate Section 316(b). Section 9.06, on which the plaintiffs rely, does not do so either. Instead, it generally states that any supplemental indenture "shall comply with the [Trust Indenture Act]." To avoid inconsistencies with other references in the Indenture to specific sections of the Trust Indenture Act, Section 9.06 must mean that any supplemental indenture shall comply with the Trust Indenture Act to the same extent as the original indenture. It ensures that any supplemental indenture will be subject to the same specific sections of the Trust Indenture Act and the same modifications to the application of those sections. It does not incorporate the Trust Indenture Act as a whole and hence does not bring with it the strictures of Section 316(b).

### 3. Even If Section 316(b) Applied, It Would Not Prohibit The Conversion Formula Amendment.

Finally, even if Section 316(b) applied to the Indenture, it would not prohibit the Conversion Formula Amendment. The plain language of Section 316(b) states that it protects "the right of any holder of any indenture security to receive payment of the principal of and interest on such indenture security, on or after the respective due dates expressed in such indenture security . . . ." 15 U.S.C. § 77ppp(b). The plain language of Section 316(b) does not extend to consideration received under a conversion right.

---

outstanding if the requirements for such exclusion set forth in TIA Section 310(b)(1) are met."); *id.* § 7.11 ("The Trustee shall comply with TIA Section 311(a), excluding any creditor relationship listed in TIA Section 311(b).").

Although this court has not ruled on this issue, then-Chancellor Strine observed in *dictum* that conversion rights are not covered by Section 316(b). *See RBC Capital Mkts., LLC v. Educ. Loan Tr. IV*, 2011 WL 6152282, at *5, *6 n.36 (Del. Ch. Dec. 6, 2011) (Strine, C.) ("An exception to no-action clauses for the enforcement of conversion rights, unlike the exception for enforcement of principal and interest payments, is not mandated by [Section 316(b) of] the Trust Indenture Act . . . ."). The model indentures promulgated by the American Bar Association often protect these rights, but the Trust Indenture Act does not.[8]

To expand the scope of Section 316(b) beyond its plain language, the plaintiffs quote a series of cases which state that Section 316(b) protects the "core terms" or

---

[8] *See id.* at *6 n.36; *see also* William W. Bratton & Adam J. Levitin, *The New Bond Workouts*, 166 U. Pa. L. Rev. 1597, 1659 (2018) (noting that model bond indentures often contain extra-statutory protections that "pick up redemption terms, guaranties, conversion provisions, and subordination languages"); Am. Bar Found., *Commentaries on Model Debenture Indenture Provisions 1965* 309 (1971) ("As indicated in the Sample Incorporating Indenture quoted above, the right of conversion in a convertible issue is treated as an essential right which may not be amended without the consent of each holder affected thereby. Thus, in a convertible debenture indenture, the draftsman should add to Section 902 a clause (4) protecting such right."); *id.* at 303 ("In the case of convertible debentures, Article 900 of the Model Provisions, as incorporated herein, should be amended by adding to the proviso in Section 902 a new clause to the effect that no supplemental indenture shall adversely affect the conversion rights of the Debentureholders under Article Thirteen. In the case of subordinated Debentures, Article Nine should contain a new §9-7 to the effect that no supplemental indenture shall adversely affect the rights of any holder of Senior Debt under Article Fourteen without the consent of such holder." (formatting altered)). Provisions protecting conversion rights are not universal. *See* Am. Bar Ass'n, *supra*, at 1138 (protecting "the right of any Holder of a Security to receive payment of Principal and interest on the Security," but not the right to receive payment for the exercise of conversion rights).

"payment terms" of an indenture. But these general observations are qualified by references to the noteholders' right to receive payment of principal and interest.[9] The most expansive reading of the "core terms" protected by Section 316(b) encompasses the timing of payments of principal and interest.[10] No court has held that Section 316(b) protects the

---

[9] *See, e.g.*, *Marblegate Asset Mgmt., LLC v. Educ. Mgmt. Fin. Corp.*, 846 F.3d 1, 7 (2d Cir. 2017) (explaining that Section 316(b) "prohibits non-consensual amendments of core payment terms (that is, the amount of principal and interest owed, and the date of maturity)"); *id.* at 12 (explaining that testimony at the congressional hearings over what would become the Trust Indenture Act "made it clear that [Section 316(b)] prohibited only formal changes to an indenture's core payment terms"); *id.* at 16 ("Limiting Section 316(b) to formal indenture amendments to core payment rights will not leave dissenting bondholders at the mercy of bondholder majorities."); *UPIC & Co. v. Kinder-Care Learning Ctrs., Inc.*, 793 F. Supp. 448, 452 (S.D.N.Y. 1992) ("Section 316(b) expressly prohibits use of an indenture that permits modification by majority securityholder vote of any core term of the indenture, i.e., one affecting a securityholder's right to receive payment of the principal of or interest on the indenture security on the due dates for such payments . . . ."); *id.* at 455 (explaining that the legislative history "tends to evince Congress' intent to have Section 316(b) interpreted so as to give effect to the absolute and unconditional nature of the right to payment it affords a Securityholder"); *Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 917 (2d Cir. 2010) (describing Section 316(b) as "a statutory provision requiring that bond indentures protect minority bondholders by prohibiting majority bondholders from collusively agreeing to modify the bond's payment terms"); *Petrohawk Energy Corp. v. Law Debenture Trust Co. of N.Y.*, 2007 WL 211096, at *5 (S.D.N.Y. Jan. 29, 2007) (stating that Section 316(b) prohibits "'use of an indenture that permits modification by a majority securityholder vote of any core term of the indenture,' such as the holder's right to receive payment of principal or interest" (quoting *UPIC*, 793 F. Supp. at 452)).

[10] *See UPIC*, 793 F. Supp. at 455–56 (explaining that defendants' failure to honor a repurchase right in an indenture would violate plaintiffs' right to receive payment of the principal of the indenture security on or after the respective due dates expressed in such indenture security); *see also McMahan & Co. v. Wherehouse Entm't, Inc.*, 65 F.3d 1044, 1050 n.4 (2d Cir. 1995) (describing the right to bring suit for timely payment: "Section 8.07 of the Indenture provides that debentureholders are excused from complying with the No-Action Clause in suits based on nonpayment of principal and interest on or after the

consideration that a noteholder would receive upon exercising a conversion right. As a result, Section 316(b) would not prevent the Conversion Formula Amendment even if it applied to the Indenture.

## III. CONCLUSION

The plaintiffs have failed to present a litigable challenge to Ligand's adoption of the Conversion Formula Amendment in reliance on the Conforming Amendment Provision. Ligand's motion to dismiss is granted.

---

due dates expressed in the Debenture and in suits based on the right to convert a Debenture to common stock. This is a requirement of section 316(b) of the Trust Indenture Act.").